**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **In re:** | : | Case No. |
| | : | Chapter 11 |
| **Eden Cryogenics, LLC,** | : | Judge |
| | : | |
| **Debtor.** | : | |
| | : | |

**DECLARATION OF STEVE L. HENSLEY IN SUPPORT OF FIRST DAY PLEADINGS**

Steve L. Hensley declares in accordance with 28 U.S.C §1746, as follows:

1. I am the President of Eden Cryogenics, LLC ("Eden Cryogenics," the "Debtor" or the "Company").

2. I am authorized to submit this Declaration on behalf of the Debtor.

3. As a result of my tenure with the Debtor, my review of relevant documents, and my discussions with members of the Debtor's management team, I am familiar with the Debtor's day-to-day operations, business affairs, and books and records.  Except as otherwise noted, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.  Further, except as otherwise stated, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtor's management, my review of relevant documents, my discussions with the Debtor's professionals, or my opinion, based on my experience and knowledge of the Debtor's operations and financial conditions.

4. To enable the Debtor to minimize the adverse effects of the Chapter 11 case on its business, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings").  I submit this Declaration in support of the

782116

Debtor's First Day Pleadings.[1] Capitalized terms used in this Declaration without definition shall have the meanings attributed to them in the specific First Day Pleading.

5. Part I of this Declaration describes the Debtor's businesses and the circumstances surrounding the commencement of it chapter 11 case. Part II of this Declaration sets forth the relevant facts in support of the First Day Pleadings.

## I. BACKGROUND

**A.  The Debtor's Chapter 11 Filings.**

6. On the date of the filing of this Declaration, (the "Petition Date"), the Debtor filed a voluntary petition in this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 1010-1532, as then amended (the "Bankruptcy Code"). The Debtor continues to operate its business and manage its properties as debtors-in-possession under Bankruptcy Code sections 1107(a) and 1108.

7. No creditors' committee has yet been appointed in this case by the United States Trustee. No trustee or examiner has been appointed in the chapter 11 case.

**B.  Background and Current Business Operations.**

8. The Debtor is a Delaware limited liability corporation located in Plain City, Ohio. The Debtor supports the alternative fuel, energy, aerospace, and commercial cryogenic and vacuum markets. The Debtor manufactures high quality cryogenic and vacuum systems, and each system requirement is staffed with a team of engineers, designers, and technicians as required. The Debtor has approximately 25 employees.

9. On February 23, 2006, the Debtor was formed as Brehon Cryogenics, and I was hired as general manager. In January of 2007, the company was renamed Eden Cryogenics and I was appointed president. In 2008, Coot Industries of Australia ("Coot") purchased the Debtor

---

[1] The First Day Pleadings refer to this Declaration as the "Hensley Declaration."

782116

2

and placed it under Coot's US subsidiary, Drivetrain USA, Inc. ("Drivetrain"). In November of 2010, Coot was purchased by an unrelated third-party. On February 22, 2011 Anscot LLC, a company which I partially own, purchased the Debtor from Drivetrain.

10. In concert with the Drivetrain purchase, the company borrowed $400,000 from Drivetrain.. The Drivetrain loan was paid down in the normal course of business. The loan is now approximately $70,000.

### C. Litigation With Kendall Holdings, Ltd. dba PHPK Technologies

11. Kendall Holdings, Ltd. dba PHPK Technologies ("Kendall") is a competitor of the Debtor. In 2008, Kendall sued the Debtor, Jim Mitchell, and me for an amount in excess of $10,000,000 for, *inter alia*, misappropriation of trade secrets (the "Kendall Litigation"). Mr. Mitchell and I had previously worked for PHPK, before and after it was owned by Kendall. Kendall alleged that we improperly used Kendall's proprietary information in our later employment with the Debtor. Although the Debtor and the individual defendants initially prevailed on summary judgment, the District Court decision was overturned on appeal and the matter was heard in a jury trial. On March 27, 2014, Judge Sargus, based on the jury verdict, entered final judgment in favor of Kendall. The judgment against the Debtor amounted to $2,038,496.57. The Debtor has filed a motion for retrial. Kendall is now entering its seventh year of costly litigation against the Debtor; I believe that Kendall seeks to put the Debtor out of business as Kendall has shown no interest in settling the lawsuit and has filed numerous garnishments and an execution against the Debtor. The Debtor does not have sufficient assets to post an appeal bond to stay the proceedings in aid of execution.

12. The Debtor made a demand on its insurance carrier to defend this lawsuit which demand was wrongfully refused. As a consequence, the Debtor paid approximately $2 million to defend the action and still owes more than $1 million. The Debtor also has a lawsuit pending

against the insurance carrier for more than one million dollars. This is the largest single asset of the Debtor.

13. As of March 31, 2014, the Debtor had assets totaling $1,662,127 and liabilities of $4,450,420[2] which includes $2,088,568 of unearned revenue (progress billings and payments from customers on contracts). In 2013, sales amounted to $5,430,980. Without the exorbitant costs of the Kendall litigation, the Debtor is a viable business entity but it has nonetheless experienced challenges. In an attempt to maximize the value of the Debtor for the benefit of its stakeholders, the Debtor is exploring restructuring alternatives, including the possibility of selling substantially all of its assets and prosecuting its claim against the carrier.

## II. FIRST DAY MOTIONS

14. The Debtor has filed First Day Pleadings, and respectfully requests that the Court consider entering orders granting such First Day Motions. I have reviewed each of the First Day Pleadings (including the exhibits thereto) and can attest to the truth of the facts set forth therein. Moreover, I believe that the relief sought in each of the First Day Motions (a) is vital to enable the Debtors to make the transition to, and operate in, Chapter 11 with a minimum of interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in achieving the Debtor's successful reorganization. Without the aid of this proceeding and the liquidation of all of the assets of the Debtor at execution prices, substantial value will lost and the creditors and the estate will suffer irreparable harm. In order to collect the accounts receivable and be paid for the work-in-process outlined above, the work-in-process must be completed.

A. **First Day Pleadings -- Administrative and Procedural Matters**

1. ***The Debtor's Motion For Extension Of Time To File Schedules And***

---

[2] This amount does not include the Kendall Holdings judgment.

4

782116

*Statements*

15. I am advised that pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, if the bankruptcy petition is accompanied by a list of all the debtor's creditors and their addresses, a debtor is required, within 14 days from the Petition Date, to file with the court (a) a schedule of assets and liabilities, (b) a statement of financial affairs, (c) a schedule of current income and expenditures, (d) a statement of executory contracts and unexpired leases, and (e) a list of equity security holders required by Bankruptcy Rule 1007(b) (collectively, the "Schedules and Statements").

16. I am also advised that a debtor is required to file Schedules and Statements in order to permit, among other things, parties-in-interest to understand and assess a debtor's assets and liabilities. The Debtor has commenced the task of gathering the necessary information to prepare and finalize the Schedules and Statements. However, the Debtor believes that the fourteen-day automatic extension of time to file such Schedules and Statements provided by Bankruptcy Rule 1007(c) will not be sufficient to permit completion of the Schedules and Statements as substantial management time is necessary at this time to normalize operations, contact vendors, and explore sale of the business lines and assets.

17. For the foregoing reasons, an extension of the time for the Debtor to file its Schedules and Statements for 31 additional days (for a total of 45 days) before which it must file its Schedules and Statements would provide sufficient time to prepare the Schedules and Statements without diverting critical resources in the early stages of Debtor's chapter 11 cases.

### 2. The Debtor's Motion For An Order Approving The Case Management Procedures

18. The Debtor is requesting that the Court approve the Case Management Procedures set forth in the Debtor's Motion. The Case Management Procedures establish

782116

certain notice, scheduling, case management and administrative procedures.

19. I have been advised that the Case Management Procedures will reduce the burden, complication, delay and costs associated with the administration of this Chapter 11 cases and yet provide adequate notice to creditors, and are critical to the efficient administration of these Chapter 11 cases.

### 3. The Debtor's Motion For An Order (A) Scheduling Expedited Hearings On Certain First Day Motions And (B) Approving The Form Of Notice Thereof

20. The Debtor has requested an expedited hearing on the First Day Pleadings.

21. The First Day Pleadings involve matters which require emergency and expedited hearings. Any delay in the consideration of the First Day Pleadings could have a severe and irreparable effect upon the Debtor's operations and the success of its Chapter 11 case.

22. Although the Debtor's motion requests relief without prior notice, the Debtor provided electronic or facsimile copies of the First Day Pleadings to the United States Trustee, the Twenty Largest Unsecured Creditors, and Drivetrain USA.

### B. First Day Pleadings -- Operational Matters

#### 1. Debtor's Motion For An Order Authorizing Continued Use Of Bank Accounts, Business Forms, And Cash Management System

23. The Debtor utilized an cash management system prior to the Petition Date which allowed the Debtor to collect, transfer and disburse funds and then accurately record and account for those transactions. The cash management system allows the Debtor to, among other things, control and monitor funds, ensure cash availability and liquidity, comply with customer requirements, and reduce administrative and operational burdens. The Debtor routinely deposits, withdraws and otherwise transfers funds to, from and among its bank accounts by various methods, including check, wire transfer, automated clearing house transfer, internal bank transfer and electronic funds transfer. The bank accounts are held at financially-stable banking

6

institutions.

24.    I have been advised that the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. I understand that under these circumstances, a waiver of the United States Trustee's requirement that the bank accounts be closed and that new post-petition bank accounts be opened, is warranted.  If enforced in this case such requirements would cause unnecessary disruption in the Debtor's business, thereby impairing its efforts to reorganize and pursue other alternatives to maximize the value of its estates.

25.    The cash management system consists primarily of two bank accounts at US Bank utilized by the Debtor through which it is able to effectively manage cash receipts and disbursements. The bank accounts include a business account and a payroll accounts. The bank accounts are used by the Debtor is identified in the Debtor's Motion.

26.    The cash management system includes the necessary accounting controls to enable the Debtor to trace funds and ensure that all transactions are adequately documented and readily ascertainable.   Adopting new accounts would create unnecessary administrative burdens and would be disruptive to the Debtor's business operations.  Consequently, the maintenance of the existing cash management system is in the best interests of all creditors and other parties-in-interest.

27.    The Debtor also requests authorization to continue using all business forms (including, but not limited to, letterheads, purchase orders, checks, and invoices) without reference to the Debtor's status as debtor in possession.  Changing the business forms would be expensive and burdensome to the Debtor's estate and disruptive to the Debtor's business operations. Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a debtor in possession as a result of the Debtor's providing direct notice of the

7

782116

commencement of the cases, the communications issued by the Debtor to its creditors and customers, and information circulating within the Debtor's industry. Accordingly, adding a "DIP" legend would have little practical effect, and will not be worth the costs.

### 2. *Motion Of Debtor, Eden Cryogenics, LLC, For Authority To Pay Pre-Petition Employee Payroll Expenses And Reimbursable Expenses*

28. As of the Petition Date, the Debtor employed approximately 25 employees. The employees serve in a wide variety of roles critical to the Debtor's ongoing business operations. To operate during the pendency of its chapter 11 case, the Debtor must retain its employees' skill, knowledge, and understanding of the Debtor's business. The continued and uninterrupted service of the employees is essential to the Debtor's ability to reorganize.

29. Every employee in the Debtor's entire workforce is owed less than $11,725 in Pre-Petition Employee Obligations as of the Petition Date. It is critical to make these payments to preserve morale and prevent the departure of employees who might otherwise find other employment opportunities if not paid. Consequently, the Debtor should be granted the authority, but not direction, to pay all outstanding amounts owed for accrued and unpaid Pre-Petition Employee Obligations, which include Salaries and Wages, Vacation, Health Insurance and other benefits, all of which are described below.

30. <u>Salaries and Wages</u>. Payroll services are provided by ADP and payroll is funded to ADP by the Debtor. The Debtor's average bi-weekly payroll for the employees is approximately $37,000.00, including withholdings. Certain portions of the payroll are paid in arrears. The employees were last paid on May 2, 2014 for the pay period through April 27, 2014. The Debtor is current on the Employee payroll. However, as of the Petition Date the Debtor owes the employees salaries and wages in the approximate aggregate amount of $26,000

31. <u>Vacations, Sick Leave, and Holidays.</u> The Debtor also offers additional

compensation, including vacation pay, sick leave, holiday pay, indemnification and the reimbursement of allowable expenses. This additional compensation is usual and customary within the Debtor's industry and is necessary to the Debtor's business operations. As of the Petition Date, the aggregate value of these accrued days is approximately $20,000. The Debtor request authority, in the exercise of its discretion, to continue to accrue vacation, holiday and personal leave in accordance with established policies and to pay any outstanding amounts related thereto.

32. <u>Reimbursement Obligations</u>. In accordance with established policies, the Debtor also reimburses Employees for allowable business expenses, including expenses for travel, lodging, meals, supplies, phone and other miscellaneous expenses (collectively, the "Reimbursable Expenses"). As of the Petition Date the Debtor estimate that the Reimbursable Expenses total approximately $1,370. The Debtor request authority, in the exercise of their discretion, to continue to pay Reimbursable Expenses and to pay any outstanding amounts related thereto.

33. <u>Health Benefits.</u> The Debtor also offers eligible Employees other benefits including health benefits (including medical, dental, prescription drug and vision). The health benefits are provided to eligible Employees through United Healthcare. As of the Petition Date, the Debtor estimates that the total amount due for the health benefits is approximately $14,380. The Debtor requests authority, in the exercise of its discretion, to continue to provide health benefits in accordance with established policies (or otherwise) and to pay any outstanding amounts related thereto.

34. <u>401(k) Plan.</u> The Debtor also offers eligible Employees other benefits including a 401(k) Plan. As of the Petition Date, the Debtor estimates that the total amount due for the 401(k) Plan is $0. The Debtor requests authority, in the exercise of its discretion, to continue to

9

provide the 401(k) Plan benefit in accordance with established policies (or otherwise) and to pay any outstanding amounts related thereto.

35.     Workers' Compensation Obligations.  In Ohio, the Debtor maintains coverage through the State of Ohio Bureau of Workers Compensation (the "Ohio BWC Program"). The Company's annual premium for coverage under the Ohio BWC Program is paid semi-annually in approximately July and January.

36.     Direction to Banks. Finally, the Debtors seek an order (a) authorizing and directing the financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Pre-Petition Employee Obligations — either before, on, or after the Petition Date — to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts and (b) prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to employees' accounts for Pre-Petition Employee Obligations. Financial institutions should be authorized and directed to rely on the representations of the Debtors as to which checks, drafts or wire transfers are in payment of the Pre-Petition Employee obligations.

37.     Any party receiving payment from the Debtors should be authorized and directed to rely upon the representations of the Debtors as to which payments are authorized by the requested relief.

38.     Continued payment, when due, of pre-petition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs and practices underlying the Pre-Petition Employee Obligations and described herein is necessary to ensure the ongoing services of the Debtor's Employees. The Employees are vital to the Debtors continuing operations and to the ultimate ability of the Debtors to reorganize in their chapter 11

cases. The Court should grant the bank direction requests discussed above.

> **3.    *The Debtor's Motion Order (A) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Services And On Account Of Nonpayment Of Prepetition Invoices And (B) Establishing Procedures For Determining Requests For Additional Assurance***

39.    In connection with the operation of its business, the Debtor obtains Utility Services from various utility companies. Uninterrupted utility services are critical to the Debtor's ability to sustain its operations during the pendency of its chapter 11 cases. Accordingly, the Debtor respectfully requests that the Court prohibit the Utility Companies described in *The Debtor's Motion Order (A) Prohibiting Utility Companies From Altering, Refusing, Or Discontinuing Services And On Account Of Nonpayment Of Prepetition Invoices And (B) Establishing Procedures For Determining Requests For Additional Assurance* (the "Utilities Motion") from altering, refusing, or discontinuing utility services to, or discriminating against the Debtor, on account of amounts outstanding prior to the Petition Date or any perceived inadequacy of the Debtor's proposed adequate assurance.

40.    I have been advised that the Utility Companies have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code based on the proposed payments discussed in the Utilities Motion. In addition, the Debtor's proposed procedures for determining requests for additional or different adequate assurance of payment to Utility Companies for future utility services are fair and should be approved.

41.    The Debtor fully intends to pay all post-petition obligations owed to the Utility Companies in a timely manner. The Debtor expects to have sufficient cash to pay all post-petition obligations for Utility Services. Nevertheless, the Debtor proposes to provide a deposit equal to a half-month's Utility Service to any Utility Company requesting such a deposit in writing, provided that such Utility Company is not currently paid in advance for its services. I

782116

have been advised that this proposed course of action, in conjunction with the other Proposed Adequate Assurance measures elaborated in the Utilities Motion provides the Utility Companies with adequate assurance.

> **4.     *Motion Of Eden Cryogenics, LLC, Debtor And Debtor-In-Possession, For Interim And Final Orders (1) Authorizing The Debtor To Use Cash Collateral And To Provide Adequate Protection; And (2) Scheduling A Final Hearing***

42.    The Debtor does not have sufficient available sources of working capital without the use of the Cash Collateral.  The Debtor has an immediate need to use the Cash Collateral to, among other things, complete the contracts and work-in-process, generate new accounts receivable, and complete all contracts from which the accounts receivable arise.  In addition, access to the Cash Collateral will provide the Debtor's customers and vendors with the requisite security that the Debtor will be able to continue conduct its businesses in the ordinary course without interruption.  In the absence of immediate authorization of the use of the Cash Collateral, the Debtor could not continue to operate its business, and immediate and irreparable harm to the Debtor and its estates would occur.

43.    Drivetrain is a prepetition secured lender to Eden Cryogenics.  In 2011, it loaned $400,000 to Eden Cryogenics contemporaneously with the transfer of the Eden Cryogenics stock to the new owner.  The indebtedness was secured by all of the Debtor's assets, and the security interest was properly perfected by the filing of a financing statement.  The loan from Drivetrain was to be repaid over a 3 year period of time through the payment of money from operations and the supply of accounting services to Drivetrain. The Debtor has reduced the indebtedness to Drivetrain to approximately $98,000, less a setoff for approximately $30,000 for financial accounting services supplied by the Debtor's accounting department to Drivetrain.

782116

44. Eden Cryogenic's equipment has a fair market value of in excess of $200,000. Thus, Drivetrain is substantially oversecured by the equipment alone. Drivetrain is further perfected by inventory of $565,000 and accounts receivable and work-in-process of $155,000. However, to collect the accounts receivable and realize upon the work-in-process, the Debtor's underlying contracts must be completed.

45. Debtor's counsel has informed me that under section 363(c)(2) of the Bankruptcy Code, the Debtor may not use Cash Collateral without the consent of the prepetition secured lender or authority granted by the Court. I am further advised that Bankruptcy Code section 363(e) provides that on request of an entity that has an interest in property to be used by a debtor, the Court shall prohibit or condition such use as necessary to provide adequate protection of such interest. Drivetrain has consented to the use of the Cash Collateral pursuant to the Budget and under the proposed Interim Order.

46. The Debtor submits that the adequate protection to be provided to Drivetrain is sufficient to approve the use of the Cash Collateral under section 363 of the Bankruptcy Code. The Debtor's obligations under the Loan Agreement with Drivetrain are substantially oversecured. The obligations to Drivetrain net at about $70,000. The Debtor's equipment alone--secured by first priority liens of Drivetrain--has a fair market value of in excess of $200,000. Thus, the use of cash collateral will have no effect on Drivetrain because it is otherwise fully secured.

> **5.** ***Application Of Debtor Pursuant To Fed. R. Bankr. P. 2014(A) For An Order Under Section 327(A) Of The Bankruptcy Code Authorizing The Employment And Retention Of Bailey Cavalieri LLC Nunc Pro Tunc As Counsel For The Debtor And Debtor In Possession***

47. Prior to commencement of the Debtor's chapter 11 case, the Debtors sought the services of Bailey Cavalieri LLC ("BC") with respect to, among other things, advice regarding

13

782116

restructuring matters in general and preparation for the Debtor's chapter 11 cases. In this regard, BC has performed extensive legal work for the Debtor in connection with its ongoing restructuring efforts including, but not limited to, financing and creditor issues. As a result of representing the Debtor on such matters, BC has acquired knowledge of the Debtor and its businesses and is familiar with the Debtor's capital structure, corporate structure, financing documents, and other material agreements.

48. The Debtor's continued representation by its pre-petition restructuring and bankruptcy counsel, BC, is critical to the Debtor's efforts to restructure is businesses because BC is familiar with the Debtor's businesses and legal and financial affairs and, accordingly, is well suited to guide the Debtor through the Chapter 11 process. Furthermore, BC has significant experience and knowledge in the fields of debtor/creditor rights and business reorganizations under Chapter 11 of the Bankruptcy Code. Accordingly, the Debtor desires to employ BC under the terms set forth in the Application.

49. The Debtors selected BC because of the firm's pre-petition experience with and knowledge of the business, as well as its experience and knowledge in the field of Debtor's and creditors' rights and business reorganizations under Chapter 11 of the Bankruptcy Code. As noted above, BC is well qualified to act on the Debtor's behalf.

**CONCLUSION**

50. In the near term, to minimize any loss of value of its businesses during the restructuring, the Debtor's immediate objective is to maintain a business-as-usual atmosphere during the pendency of their Chapter 11 case, with as little interruption or disruption to the Debtor's operations as possible. I believe that if the Court grants the relief requested in each of the First Day Pleadings, the prospect for achieving these objectives and completing a successful, rapid reorganization of the Debtor's businesses will be substantially enhanced.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge and belief.

Executed this 7th day of May, 2014.

> /s/Steve L. Hensley_____
> Steve L. Hensley, President
> Eden Cryogenics, LLC

Respectfully submitted,

*/s/ Matthew T. Schaeffer*_____
Nick V. Cavalieri      (0013097)
Matthew T. Schaeffer (0066750)
Bailey Cavalieri LLC
10 West Broad Street, Suite 2100
Columbus, Ohio 43215
614.221.3155 (telephone)
614.221.0479 (telefax)
nick.cavalieri@baileycavalieri.com
matthew.schaeffer@baileycavalieri.com

*Counsel for Eden Cryogenics, LLC*

782116